In the District Court of the United States
For the District of South Carolina
CHARLESTON DIVISION

| | | |
|---|---|---|
| Khanh G. Doan, | ) | Civil Action No.  2:07-1572-PMD-GCK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| QualxServ and | ) | **OF THE MAGISTRATE JUDGE** |
| Tom Doonan, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.   INTRODUCTION

The Plaintiff, Khanh G. Doan ("Plaintiff" or "Doan"), proceeding *pro se* and *in forma pauperis*, filed this action on June 6, 2007 against his current employer, QualxServ ("QualxServ" or the "Company") and his supervisor, Tom Doonan ("Doonan"), alleging that Doonan harassed[1] him and discriminated[2] against him because of his race (Asian) and/or his national origin (Vietnamese).[3]  The Court will consider these allegations in light of Section 703(a)(1) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*[4]  Pursuant to the

---

[1]    *See Pro Se* Complaint [1] at p. 4.

[2]    *See Pro Se* Complaint [1] at p. 5.

[3]    *See* Plaintiff's Answers to Defendants' Interrogatories, attached to [38] at p. 2.

[4]    As a threshold matter, this Court questions whether it has jurisdiction over Plaintiff's claims.  *See* 28 U.S.C. 1331, 1332.  Generally, a case can be originally filed in a federal district court if there is diversity of citizenship under 28 U.S.C. § 1332 or there if there is so-called "federal question" jurisdiction under 28 U.S.C. § 1331.  Federal courts are courts of limited jurisdiction, "constrained to exercise only the authority conferred by Article III of the Constitution and affirmatively granted by federal statute ."  *In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir. 1998).  Since federal courts have limited subject matter jurisdiction, there is no presumption that the court has jurisdiction.  *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999).  Accordingly, a federal court is required, *sua sponte*, to determine if a valid basis for its jurisdiction exists, "and to dismiss the action if no such ground appears."  *Bulldog Trucking*, 147 F.3d at 352; *see also* F.R. Civ. P.

provisions of 28 U.S.C. § 636(b)(1)(B), and Local Rule 73.02(B)(2)(g), D.S.C., the undersigned

United States Magistrate Judge is authorized to review all pretrial matters in cases filed under 42

U.S.C. § 2000e, *et seq.*, and submit findings and recommendations to the District Court.

## II.    *THE PRO SE* COMPLAINT

The Plaintiff filed this action *pro se*, and thus his pleadings are accorded liberal

construction.[5]  *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*); *Estelle v. Gamble*, 429 U.S.

---

12(h)(3) ("Whenever it appears ... that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

"A Plaintiff must allege the facts essential to show jurisdiction in his pleadings." *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).  *See also Dracos v. Hellenic Lines, Ltd.*, 762 F.2d 348, 350 (4th Cir. 1985) ("plaintiffs must affirmatively plead the jurisdiction of the court").  To this end, Federal Rule of Civil Procedure 8(a)(1) requires that the complaint provide "a short plain statement of the grounds upon which the court's jurisdiction depends[.]"  *See Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (discussing notice pleading under Rule 8(a)).  If, however, the complaint does not contain "an affirmative pleading of a jurisdictional basis, the federal court may find that it has jurisdiction if the facts supporting jurisdiction have been clearly pleaded."  *Pinkley, Inc.*, 191 F.3d at 399 (*citing 2 Moore's Federal Practice* § 8.03[3] (3rd edition 1997)).

The plaintiff's complaint arguably sets forth state law claims for discrimination based on race and national origin(in violation of S.C. Code 1-13-10 *et seq.*) and a common law cause of action for wrongful termination.  A plaintiff may proceed on a state law claim in federal court if the diversity jurisdiction statute is satisfied.  Diversity jurisdiction is present if the Complaint alleges that the parties are of diverse citizenship and that "[t]he matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332," an amount in controversy in excess of seventy-five thousand dollars ($75,000.00). See 28 U.S.C. § 1332(a). see Fed.R.Civ.P. 84; Fed.R.Civ.P. app. Form 2(a).  Complete diversity of parties in a case means that no party on one side may be a citizen of the same State as any party on the other side.  *See Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 372-374 (1978).  Here, no such jurisdictional basis is set forth in the pleading. Plaintiff names QualxServ and Tom Doonan as Defendants, but does not provide any information regarding the citizenship of these Defendants.  Furthermore, the Complaint does not list any amount in controversy, but seeks the following relief, as set forth *verbatim* in the Complaint:

> Please gave me my innocent of work and pay for all the money I lost.  Stress and unfair tre[atment].

Although the undersigned questions whether the Court has jurisdiction over this case, it will nevertheless address the case on its merits.

[5]    Plaintiff later retained counsel, who entered an appearance on his behalf on November 20, 2007.  [44]

97 (1976); *Haines v. Kerner*, 404 U.S. 519 (1972); *Loe v. Armistead*, 582 F. 2d 1291 (4th Cir. 1978); *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir.), *cert. denied, Leeke v. Gordon*, 439 U.S. 970 (1978). Under established local procedure in this judicial district, a careful review has been made of the *pro se* complaint herein pursuant to the procedural provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, Title I, § 104, 110 Stat. 1214, codified at 28 U.S.C. § 1915. This review has been conducted in light of the following precedents: *Denton v. Hernandez*, 504 U.S. 25 (1992); *Neitzke v. Williams*, 490 U.S. 319, 324-25 (1989); *Haines v. Kerner*, 404 U.S. 519 (1972); *Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951 (4th Cir. 1995) (*en banc*), *cert. denied*, 516 U.S. 1177 (1996); *Todd v. Baskerville*, 712 F.2d 70 (4th Cir. 1983).

   *Pro se* pleadings are held to a less stringent standard than those drafted by attorneys. *Hughes*, 449 U.S. at 8. Even under this less stringent standard, however, the *pro se* complaint nonetheless may be subject to summary dismissal. The mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so, but a district court may not rewrite a petition to include claims that were never presented. *Barnett v. Hargett*, 174 F.3d 1128 (10th Cir. 1999). Likewise, a court may not construct the plaintiff's legal arguments for him (*Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993)) or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986). The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court. *Rice v. National Security Council*, 244 F.Supp. 2d 594, 596 (D.S.C.

2001), *citing Weller v. Dep't of Social Services*, 901 F.2d 387 (4th Cir. 1990).

### III.    *IN FORMA PAUPERIS* REVIEW

The complaint *sub judice* has been filed pursuant to 28 U.S.C. § 1915, which permits an indigent litigant to commence an action in federal court without paying the administrative costs of proceeding with the lawsuit.  To protect against possible abuses of this privilege, the statute allows a district court to dismiss the case upon a finding that the action "fails to state a claim on which relief may be granted" or is "frivolous or malicious."  28 U.S.C. § 1915(e) (2)(B)(i), (ii). A finding of frivolity can be made where the complaint "lacks an arguable basis either in law or in fact."  *Denton v. Hernandez*, 504 U.S. 25, 31, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992). Hence, under § 1915(e)(2)(B), a claim based on a meritless legal theory may be dismissed *sua sponte*. *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Allison v. Kyle*, 66 F.3d 71 (5th Cir. 1995).  The court may dismiss a claim as "factually frivolous" under § 1915(e) if the facts alleged are clearly baseless.  *Denton*, 504 U.S. at 31.  In making this determination, the court is not bound to accept without question the truth of the plaintiff's allegations, but rather need only weigh the plaintiff's factual allegations in his favor.  *Id*.

### IV.    FACTS

#### A.  Stipulated Facts

The Plaintiff and the Defendants have stipulated to the following facts, as set forth in their Joint Factual Brief ("JFB"), filed pursuant to an Order of the Court:

1.    QualxServ is headquartered in Tewksbury, Massachusetts and is in the business of, among other things, providing computer technicians for repair services in private homes and businesses during warranty or service contract periods.

2.      QualxServ employs technicians in two general capacities:  the first is a group of full-time technicians known as Field Service Representatives ("FSRs") and the second is a group of part-time technicians known as QualxServ Service Partners ("QSPs").

3.      QualxServ has agreements with various computer manufacturers to provide technicians for maintenance and warranty work relating to their systems.

4.      Doan has been a QualxServ QSP in Charleston, South Carolina since March 20, 2000, when he was hired by Getronics, a predecessor of QualxServ.

5.      Doan has reported to various managers through the years, including from October 2005 to June 2006, Peter Kalogeropoulos, and then from June 2006 to March 2007, Thomas Doonan, both of whom were at the time Doan reported to them Regional Operations Supervisors.  In March 2007, Doonan was transferred to a different position and, since that date, Doan has again reported to Kalogeropoulos.

6.      QSPs are considered part-time employees and are paid on a per call basis.  When Doan began work for QualxServ, he was paid at a rate of $35 per call.  Effective January 6, 2003, QualxServ reduced the rate paid to all QSPs, including Doan, to $32 per call.

7.      Doan is responsible for service calls within 21 ZIP codes.

8.      QualxServ has a variety of policies applicable to QSPs, including the Standards of Ethics and Business Conduct Policy.

9.      Doan agreed to comply with the Standards of Ethics and Business Conduct Policy (the "Policy") when his employment was transitioned from the Company's predecessor, Getronics, to QualxServ in May 2000.

10.     The Policy states that employees are to perform their duties "responsibly, honestly,

diligently, and with good judgment, in conformity with policies, procedures and standards established by the Company."  The Policy also states that employees are to:  (1) "'avoid conflicts of interest and other situations which might prove harmful to the Company"; (2)

"avoid even the appearance of impropriety"; (3) refrain from using "their position at the Company to benefit any other business or person outside of the Company, or to benefit themselves independently of the Company's business[]" and (4) refrain from "participat[ing] directly or indirectly in any outside business activity involving contact with or work for customers, unless the activity is approved in writing by the Legal Department."

11.     In August 2006, Doan went on a service call in a private home to replace the hard drive on a computer manufactured by a large computer company.

12.     On Monday, August 21, 2006, Doan left two voicemail messages for Karen Moriarty of Human Resources, asking her to call him.  Moriarty returned Doan's calls on that day and spoke with Doan at length.  Doan recorded the telephone calls.  Doan did not inform Moriarty that he was doing so.

13.     Doan told Moriarty that Doonan had fired him without providing a "good" or "clear" reason.  Moriarty agreed to review the incident and get back to Doan about his employment.

14.     After finishing the call with Doan, Moriarty spoke to Doonan, who confirmed Doan was a good technician and said this was the first time there had been a serious issue with respect to Doan.  Moriarty asked Doonan if he would consider reinstating Doan and

Doonan agreed to do so.

15.     Moriarty went back to her office and called Doan to inform him QualxServ was changing

the termination decision to a written warning, and that he could have his job back.  Doan

recorded the conversation without Moriarty's permission.

16.     During the conversation, Doan told Moriarty he wanted to discuss another issue with her,

which was that he wanted to increase his call volume to what it had been when he was

first employed by QualxServ.

17.     QualxServ reinstated Doan on August 21, 2006.

18.     In 2003, QualxServ began to limit the number of calls QSPs could take on a weekly

basis. Under the policy, QSPs are generally limited to either 30 calls or 30 hours per

week.  The policy applies to all QSPs.

<u>**B.  The Plaintiff's Statement of Facts in Controversy**</u>
<u>**and the Defendants' Responses Thereto**</u>

The Plaintiff has set forth the following Statement of Facts believed to be in controversy,

and the undersigned has set forth the Defendants' corresponding responses to those facts.

***Plaintiff's Fact #1 in Controversy:***

The Plaintiff did not receive any training on the conduct policy.

***Defendants' Response:***

The Defendants dispute this contention but state the resolution of the factual issue is not

material to the resolution of Defendants' Motion for Summary Judgment because:  (i) Plaintiff

agreed to abide by QualxServ's policies as a condition of employment (Joint Factual Brief

("JFB") Section I ¶9); and (ii) the issue for this motion is whether QualxServ disciplined Doan

because of his violation of a policy as opposed to his race, not whether Doan's violation was

done knowingly or whether he was inadequately trained in some fashion.

***Plaintiff's Fact #2 in Controversy:***

The Plaintiff received $64,715.00 pay for the year of 2001.

***Defendants' Response:***

The Defendants agree that Plaintiff's wages from QualxServ for the year 2001 were $64,715.

***Plaintiff's Fact #3 in Controversy:***

The Plaintiff received $87,605.00 pay for the year of 2002.

***Defendants' Response:***

The Defendants agree that Plaintiff's wages from QualxServ for the year 2002 were $87,605.00.

***Plaintiff's Fact #4 in Controversy:***

The Plaintiff received $71,995.50 pay for the year of 2003.

***Defendants' Response:***

The Defendants agree that Plaintiff's wages from QualxServ for the year 2003 were $71,995.50.

***Plaintiff's Fact #5 in Controversy:***

The Plaintiff received $41,856.83 pay for the year of 2004.

***Defendants' Response:***

The Defendants agree that Plaintiff's wages from QualxServ for the year 2004 were $41,856.83.

***Plaintiff's Fact #6 in Controversy:***

The Plaintiff received $44,100.92 pay for the year 2005.

***Defendants' Response:***

The Defendants agree that Plaintiff's wages from QualxServ for the year 2005 were $44,100.92.

***Plaintiff's Fact #7 in Controversy:***

The Plaintiff received $36,727.95 pay for the year 2006.

***Defendants' Response:***

The Defendants agree that Plaintiff's wages from QualxServ for the year 2006 were $36,727.95.

***Plaintiff's Fact #8 in Controversy:***

The Defendant changed the policy of the number of calls in 2003.

***Defendants' Response:***

Defendants are unsure of what is meant by the assertion the "Defendant changed the policy of the number of calls in 2003" but state that, in 2003, QualxServ began to limit the number of calls QSPs could take on a weekly basis. Under the policy, QSPs are generally limited to either 30 calls or 30 hours per week. The policy applies to all QSPs. See JFB Section I ¶18.

***Plaintiff's Fact #9 in Controversy:***

The Plaintiff suffered a reduction in income from 2003 to 2004.

***Defendants' Response:***

The Defendants agree that Plaintiff's wages from QualxServ decreased from 2003 to 2004.

*Plaintiff's Fact #10 in Controversy:*

The Plaintiff actually had an increase between 2004 and 2005 of 8 percent even though the policy of reduction in number of calls was still in force.

*Defendants' Response:*

The Defendants agree that Plaintiff's wages from QualxServ increased between 2004 and 2005.  The remainder of the assertion in Paragraph 10 of Plaintiff's Statement of Facts is argument.

*Plaintiff's Fact #11 in Controversy:*

The Plaintiff then has a reduction in income of 18 percent when Doonan becomes his supervisor in 2006.

*Defendants' Response:*

The Defendants deny this assertion.  While there was a reduction in Plaintiff's income between 2005 and 2006, Doonan did not become Plaintiff's supervisor until June of that year (*see JFB Section I* ¶ 5) and there is no factual support for the contention that the decline in Plaintiff's income from one calendar year to the next was in any way attributed to Doonan's assumption of managerial responsibilities mid-way through the second comparative year.

*Plaintiff's Fact #12 in Controversy:*

The Plaintiff had no problems with his employment.

*Defendants' Response:*

The Defendants deny this assertion because, in fact, Plaintiff's acceptance of payment for additional services provided to a customer was a violation of QualxServ's policies and could thus be deemed a "problem" with his employment.  *See JFB Section I ¶10.*  Nevertheless, a

peripheral factual dispute as to whether Plaintiff had any "problems" with his employment is not material to the resolution of Defendants' Motion for Summary Judgment because Defendants do not contest that Doan was–and remains–qualified for the position of QSP.

**Plaintiff's Fact #13 in Controversy:**

Prior to Doonan becoming the Plaintiff's supervisor the Plaintiff's service area included Georgetown, Walterboro, Moncks Corner, Edisto, James Island, Johns Island, West Ashley, Kiawah Island, Downtown Charleston, and Seabrook Island.

**Defendants' Response:**

The Defendants state that Georgetown, Walterboro, Moncks Corner, Edisto were never within Doan's territory while Doonan was his supervisor. The other areas were within his service area prior to Doonan becoming his supervisor and remained within his service area throughout Doonan's supervision of Plaintiff. *See JFB Section I ¶ 7.*

**Plaintiff's Fact #14 in Controversy:**

The Defendant Doonan hired 4 technicians to cover the Plaintiff's service area in July 2006 not long after he became the Plaintiff's supervisor.

**Defendants' Response:**

The Defendants deny this allegation and further state that Plaintiff has offered no admissible evidence in support of his contention, failing to even identify the names of the technicians. In any event, there were only two other technicians hired in Plaintiff's area during Doonan's supervision of Plaintiff: (1) Robert Jeffcoat, a Caucasian, who was hired on June 14, 2006, prior to the incident in August 2006; and (2) Maurese Odom, an African-American, hired October 2, 2006. There was a third substitute technician taking calls in the area whose name is

Johnathan Wolff.  Wolff began running calls for QualxServ in January 2006, several months before Doonan became Plaintiff's supervisor.  *See*  Record Appendix Ex. 1 – Affidavit of Thomas Doonan in Support of Defendants' Motion for Summary Judgment ¶8; *see also* Affidavit of Karen Moriarty in Support of Defendants' Reply to Plaintiffs' Response to Motion for Summary Judgment ¶3.

***Plaintiff's Fact #15 in Controversy:***

The technicians that were hired were not in the Plaintiff's protected class.

***Defendants' Response:***

See Response to Paragraph 14. Defendants' admit that neither Jeffcoat nor Odom is Asian or Vietnamese.  Defendants are unaware of the ethnicity or national origin of Wolff, the substitute technician.

***Plaintiff's Fact #16 in Controversy:***

The Plaintiff would receive information on what call to go on through the QualxServe Interface.

***Defendants' Response:***

The Defendants agree that Plaintiff would receive information on what call to go on through the use of a computer program referred to as the Call Assignment Tool ("CAT").

***Plaintiff's Fact #17 in Controversy:***

That in July 2006 the Defendant, Tom Doonan, hired 4 more technicians for the Plaintiff's area.

***Defendants' Response:***

See Response to Paragraph 14.

***Plaintiff's Fact #18 in Controversy:***

The Plaintiff actually received a check from the customer.

***Defendants' Response:***

The Defendants agree that the Plaintiff received a check with respect to the payment for the services he had provided in violation of QualxServ's policy of prohibiting independent work for its customers.

***Plaintiff's Fact #19 in Controversy:***

That on August 2006, a customer called the Plaintiff at his home.

***Defendants' Response:***

The Defendants state that there are factual disputes regarding the precise circumstances of the unauthorized out-of-contract work performed by Plaintiff in August 2006, which is the subject matter of Paragraphs 19-32 of Plaintiff's Statement of Facts.  QualxServ understood at the time of the incident that the customer had asked Plaintiff to install the software while he was still in her home and that he had done the work then. *Record Appendix Ex. 1 – Affidavit of Thomas Doonan in Support of Defendants' Motion for Summary Judgment ¶¶3-4.* The Plaintiff has testified that the customer contacted him on his QualxServ cell phone after he had left, that he drove to the customer's house to pick up her computer, installed the software at his home over the weekend, and then brought the computer back on August 15, 2006.  The Plaintiff has further testified that the computer was working after he returned it but the customer called him the next day to say she was still experiencing problems. *Record Appendix Ex. 3 – Doan TR 52-56.* Without notifying QualxServ of the ongoing work he was performing for the customer, the Plaintiff returned to her house on August 17, diagnosed a modem problem and instructed her to

call the computer manufacturer to request a new modem.  *Id.*  When the computer

manufacturer's representative suggested there might be a problem with the software installation,

QualxServ's customer informed the representative, while Plaintiff was in the room with her, that

she had just paid the technician sent to fix the initial problem $100 to install the software.  *Id.*

Later that day, the computer manufacturer called QualxServ's Situation Management Team

("SMT") to complain about a technician's soliciting and taking cash from its customer.  *Record*

*Appendix Ex. 1 – Affidavit of Thomas Doonan in Support of Defendants' Motion for Summary*

*Judgment ¶3.* SMT then contacted Doonan and asked him to investigate the matter.  *Id.*  Doonan

telephoned the customer to ask what happened.  *Id.*  The customer told Doonan that Plaintiff

came to her house on a service call to repair her computer and that, while he was there, she asked

him if he could also help her install some software on her computer.  *Id.*  The Plaintiff agreed to

do the installation in exchange for a $100 fee.  *Id.*  The customer stated Plaintiff did the work

and she paid him the fee but was still having problems with the computer.  After speaking with

the customer, Doonan spoke to Plaintiff about the incident, who admitted he had accepted a

payment from a customer to install software.  *Id*. at ¶4.  Doonan informed Plaintiff that his

actions violated Company policy, that the computer manufacturer was upset about the incident,

and that the customer was upset about the incident.  *Id.*  Plaintiff told Doonan he did not know he

could not take money from customers to install software and that he had done it in the past.  *Id*.

Doonan told Plaintiff that accepting separate payments from customers for any work violated

QualxServ policy.  *Id.*  After consulting with the Human Resources Department, Doonan

informed Plaintiff that his employment with QualxServ was terminated.  *Id.*  Doonan later agreed

to rescind the termination and instead provided a written warning. *Id. at ¶7.*

***Plaintiff's Fact #20 in Controversy:***

At that time the customer requested that the Plaintiff reinstall the software on her computer and she would pay the Plaintiff $100.00.

***Defendants' Response:***

See Response to Paragraph 19.

***Plaintiff's Fact #21 in Controversy:***

That the Plaintiff picked up her computer on Friday and worked on the computer that weekend at his home.

***Defendants' Response:***

See Response to Paragraph 19.

***Plaintiff's Fact #22 in Controversy:***

That the Plaintiff returned the computer to the customer.

***Defendants' Response:***

See Response to Paragraph 19.

***Plaintiff's Fact #23 in Controversy:***

The customer paid the Plaintiff with a check for $100.00.

***Defendants' Response:***

See Response to Paragraph 19.

***Plaintiff's Fact #24 in Controversy:***

The Plaintiff returned the customer's computer at that time the customer informed the Plaintiff that there was a problem.

***Defendants' Response:***

See Response to Paragraph 19.

***Plaintiff's Fact #25 in Controversy:***

That the Plaintiff arrived at her home on the 17th of August and checked the computer.

***Defendants' Response:***

See Response to Paragraph 19.

***Plaintiff's Fact #26 in Controversy:***

That at that time the Plaintiff discovered that she needed to call Dell for a new modem because the computer still under warranty.

***Defendants' Response:***

See Response to Paragraph 19.

***Plaintiff's Fact #27 in Controversy:***

That Dell Tech Support gave the customer the run around and tried to inform her that the software needed to be reinstalled.

***Defendants' Response:***

See Response to Paragraph 19.

***Plaintiff's Fact #28 in Controversy:***

That she informed them that she had just paid to have the software reinstalled.

***Defendants' Response:***

See Response to Paragraph 19.

***Plaintiff's Fact #29 in Controversy:***

That at that time Dell sent the customer a new modem.

***Defendants' Response:***

See Response to Paragraph 19.

**Plaintiff's Fact #30 in Controversy:**

That the customer informed the Plaintiff that after the new modem was installed there was no problem with the Computer.

**Defendants' Response:**

See Response to Paragraph 19.

**Plaintiff's Fact #31 in Controversy:**

The day the Plaintiff closed the call for the Defendant and the day that the Plaintiff received the check from the customer were two separate days.

**Defendants' Response:**

See Response to Paragraph 19.

**Plaintiff's Fact #32 in Controversy:**

The Plaintiff actions were not on the Defendant's time and were not a violation of the Defendant's policies.

**Defendants' Response:**

See Response to Paragraph 19.  In addition, the assertion that Plaintiff's actions were "not a violation" of policy is argument that can be resolved by the Court by reference to the policies and the undisputed facts, which show that Plaintiff's actions were, in fact, a violation of the Company's policies.

**Plaintiff's Fact #33 in Controversy:**

The Plaintiff transferred calls from one basket to another prior to Doonan being his supervisor with no problems and no approval.

***Defendants' Response:***

The Defendants dispute this contention but state the resolution of the factual issue is not material to the resolution of Defendants' Motion for Summary Judgment because QualxServ did not take any adverse employment action as a result of Doan's unauthorized transfer of calls to himself. Instead, Doan was simply reminded that he should not scoop others' calls in the future. *Record Appendix Ex. 1 – Affidavit of Thomas Doonan in Support of Defendants' Motion for Summary Judgment ¶14.*

***Plaintiff's Fact #34 in Controversy:***

The Plaintiff continues today to do the same transfers without supervisor approval.

***Defendants' Response:***

The Defendants dispute this contention but state the resolution of the factual issue is not material to the resolution of Defendants' Motion for Summary Judgment.

***Plaintiff's Fact #35 in Controversy:***

The only time the Plaintiff suffered repercussions of transferring a call from one technician[,] basket [sic] to another was while Doonan was his supervisor.

***Defendants' Response:***

See Response to Paragraph 34.

***Plaintiff's Fact #36 in Controversy:***

The Defendant controlled the posting of the Plaintiff's customer surveys.

***Defendants' Response:***

The Defendants dispute this contention but state the resolution of the factual issue is not material to the resolution of Defendants' Motion for Summary Judgment because QualxServ did

not take any adverse employment action as a result of the negative survey.  Further, the

Defendants state that Plaintiff has offered no admissible evidence in support of this assertion.

The undisputed fact is that surveys are performed by QualxServ's customers and are posted

automatically rather than by specific QualxServ managers.  *Record Appendix Ex. 1 – Affidavit of*

*Thomas Doonan in Support of Defendants' Motion for Summary Judgment ¶¶ 16-17.*

## V.    PROCEDURAL HISTORY

On June 6, 2007, Plaintiff filed this action against QualxServ and Doonan (collectively,

the "Defendants").  An answer was filed on behalf of the Defendants on July 19, 2007.  [20]

Thereafter, in November 2007, Plaintiff retained counsel who entered an appearance on his

behalf.  [44]  On January 18, 2008, the Defendants filed their Motion for Summary Judgment

and a supporting memorandum and exhibits, arguing that Plaintiff, who is presently an employee

of QualxServ, has not suffered any adverse employment action, and has not shown he was

treated differently than employees outside of his protected categories of race and national origin.

Defendants therefore argue that Plaintiff has failed to establish a *prima facie* case of

discrimination under Title VII.  Furthermore, Defendants argue that even if Plaintiff were to

establish a *prima* facie case, Defendants nonetheless have set forth legitimate, nondiscriminatory

explanations for each issue about which Plaintiff complains, and Plaintiff has not set forth any

evidence to suggest that those reasons are a pretext for discriminatory conduct.  [61]

Plaintiff filed his response in opposition to the motion for summary judgment on

February 14, 2008, contending that he can show a *prima facie* case under the standard articulated

in *McDonnell Douglas* burden shifting framework of analysis to show pretext, as well as under

the *Price Waterhouse* mixed-motive analysis.  [66 at p. 8]  The Defendants filed their reply on

February 25, 2008 [69] accompanied by a motion to strike portions of Plaintiff's affidavit which had been filed with his response.  [70]  As the issues have been joined, this matter is ripe for review.

## VI.    SUMMARY JUDGMENT STANDARD

Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues.  *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897 (1987).  This does not mean that summary judgment is never appropriate in these cases.  To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Id., quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice."  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.  *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991).  The Defendants, as the moving parties, bear the initial burden of pointing to the absence of a genuine issue of material fact.  *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the Defendants carry this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."  *Id.* at 718-19, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "[O]nce the moving party has met his burden, the nonmoving party must come forward

with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Id. and Doyle v. Sentry Inc.*, 877 F.Supp. 1002, 1005 (E.D.Va. 1995). Instead, the non-moving party is required to submit evidence of specific facts by way of affidavits (*see* Fed.R.Civ.P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. *Baber, citing Celotex Corp., supra.* Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) *and DeLeon v. St. Joseph Hospital, Inc.*, 871 F.2d 1229, 1233 n. 7 (4th Cir. 1989). Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. *Evans v. Technologies Applications & Servs. Co.*, 80 F.3d 954 (4th Cir. 1996). In addition, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## VII.    DISCUSSION

### A.  Exhaustion of Administrative Remedies

To assert a Title VII claim in federal court, a plaintiff first must exhaust his administrative remedies. *Sloop v. Memorial Mission Hosp., Inc.*, 198 F.3d 147, 148 (4th Cir. 1999); 42 U.S.C. § 2000e-5(c). A federal district court can assume jurisdiction over a Title VII

claim only after the claimant has complied with the various administrative procedures set forth in 42 U.S.C. § 2000e-5(b) & (c), part of which requires that "proceedings have been commenced under the State or local law" prior to filing with the EEOC.  *Davis v. North Carolina Dept. of Corrections*, 48 F.3d 134, 136-137 (4th Cir. 1995).  Significantly to the case *sub judice*, "commencement of proceedings under state law is a prerequisite to EEOC action where a state remedial scheme exists."[6]  In other words, if the alleged discrimination occurs in a state that has an agency that can provide a remedy against such discrimination, the complainant cannot file a charge with the EEOC until 60 days after he begins a proceeding before the state agency, unless the proceeding ends before then.  42 U.S.C. § 2000e-5(c).[7]  A state that has such an agency is called a "deferral state," because the EEOC must defer to the state agency for up to 60 days.  During the sixty day period in which the state conducts "proceedings . . . under the State or local law," 42 U.S.C. § 2000e-5(c), "[t]he EEOC holds the complaint in 'suspended animation.' "

---

[6]     The *Davis* court summed up the process by which a federal district court obtains Title VII subject matter jurisdiction:

> Title VII . . . establishes a multi-tiered administrative scheme pursuant to which a claimant is required first to file a discrimination claim under state law, where such law exists, and may not proceed to federal district court until state proceedings under state law have commenced and, after the deferral period, the EEOC has made its own determination as to the validity of complainant's claim and issued a right-to-sue letter.

*Davis*, 48 F.3d at 138.

[7]     The statute provides in pertinent part:

> In the case of an alleged unlawful employment practice occurring in a State, . . . which has a . . . law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice . . . no charge may be filed . . . by the person aggrieved before the expiration of sixty days *after proceedings have been commenced under the State or local law*, unless such proceedings have been earlier terminated . . . .(Emphasis supplied).  42 U.S.C. § 2000(e)-5(c).

*New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 64, 100 S.Ct. 2024, 2031 (1980) (*quoting*

*Love v. Pullman*, 404 U.S. 522, 526, 92 S.Ct. 616, 618, 30 L.Ed.2d 679 (1972)). The purpose of

this "first hiatus is . . . to give state administrative agencies an opportunity to invoke state rules

of law." *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 825, 110 S.Ct. 1566, 1569, 108

L.Ed.2d 834 (1990).

      The Defendant QualxServ is headquartered in Tewksbury, Massachusetts[8] and Doonan

apparently works in the QualxServ headquarters.[9] The Plaintiff filed his claim at the EEOC in

Boston, Massachusetts <u>only</u> against QualxServ on December 4, 2006 alleging discrimination

based upon race (Asian) and nationality (Vietnamese); he alleged continuing discrimination, the

latest of which occurred on November 29, 2006.[10] Massachusetts is a deferral state and the

Massachusetts Commission Against Discrimination ("MCAD") has a work share agreement with

the EEOC which causes the automatic and simultaneous institution and termination of state

proceedings when a charge of discrimination is filed with the EEOC. *Seery v. Biogen, Inc.*, 203

F.Supp.2d 35, 44 (D.Mass. 2002). Furthermore, the work sharing agreement between the

MCAD and the EEOC waives the sixty-day period for deferral to the state agency, and provides

a 300-day window for the plaintiff to file his charges with the EEOC.[11] *Cf. Lawton v. State Mut.*

---

[8]    *See* Affidavit of Karen Moriarty ("Moriarty Aff.") attached as Exhibit 2 to Defendants' Motion for Summary Judgment. [61]

[9]    *See* Moriarty Aff., Ex. 2 to [61]; *see also* Affidavit of Thomas Doonan ("Doonan Aff.") attached as Ex. 1. to [61].

[10]    *See* Plaintiff's Response to Defendants' Motion for Summary Judgment at [66-9] at p. 2.

[11]    A charge received by either party to a work sharing agreement (a state referral agency or EEOC) is generally considered received by the other party to the agreement. 29 C.F.R. § 1626.10(c). However, if a work sharing agreement does not specifically provide that the EEOC's receipt of a charge commenced state proceedings, the charging party must take additional steps beyond simply filing the charge with the EEOC to perfect filing of state charges. For example, in *Petrelle v. Weirton Steel Corp.*, 953 F.2d 148 (4th Cir. 1991),

*Life Assur. Co. of America*, 101 F.3d 218, 221 (1st Cir.1996) ("Massachusetts is a so-called 'deferral jurisdiction' . . . so exhaustion depends on the filing of a charge with the [EEOC] within 300 days of the purported discriminatory act.")

Plaintiff received his right-to-sue letter, dated May 17, 2007, from the EEOC in Boston, Massachusetts.[12]  Therefore, it appears that Plaintiff properly exhausted his administrative remedies prior to filing his Complaint on June 6, 2007.  [1]

### B.  Individual Liability of Doonan

Doonan was Plaintiff's supervisor from June 2006 to March 2007.[13]  Plaintiff specifically contends that Doonan harassed him and caused his salary to decrease.[14]  Under Title VII of the Civil Rights Act of 1994, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A Title VII claim can be asserted only against an employer and cannot be asserted against individual supervisors.  See *Lissau v. Southern Food Service, Inc.*, 159 F.3d 177, 180-181 (4th Cir. 1998) (stating that the Civil Rights Act of 1991 does not "mention individual liability as an available remedy" and that Title VII's "remedial scheme seems so plainly tied to employer, rather than individual, liability").  In *Lissau*, the Fourth Circuit Court of Appeals explained that individuals

---

the Fourth Circuit Court of Appeals interpreted a work-sharing agreement to require an actual referral from the EEOC to the West Virginia Human Rights Commission before the state agency can waive its right to 60- day period to process the charge.  In *Petrelle*, however, the Court found a presumption that the charge in that case was referred.

[12]   *See* Letter from EEOC to Plaintiff attached to Plaintiff's Answers to the Court's Special Interrogatories.  [10]

[13]   *See* Joint Factual Brief [71] at ¶ 5 of "Stipulated Facts".

[14]   *See* Complaint [1] at p. 4, III.

cannot be held liable in civil suits under Title VII because the language in the Title VII definition of

"employer"[15] was intended to make employers responsible for the acts of those who were the

employer's agents, rather than to extend personal liability to those agents. *Lissau*, 159 F.3d at 180.

Standing alone, the *Lissau* decision would require dismissal of Plaintiff's Title VII claims against

Doonan individually. However, the Court is mindful of the case of *Paroline v. Unisys Corporation*,

879 F. 2d 100 (4th Cir. 1989), wherein the court specifically announced a test ("sufficient supervisory

authority") under which an individual supervisor could be held liable "for any actionable sexual

harassment in which he personally participated." 879 F. 2d at 105. Upon rehearing *en banc*, the full

Fourth Circuit Court of Appeals reversed only a portion of the panel decision, leaving undisturbed

that part of the ruling which had accepted a theory of individual liability for supervisors. *Paroline v.*

*Unisys Corporation*, 900 F.2d 27 (4th Cir. 1990) (*en banc*) (*per curiam*). Within the Fourth Circuit,

therefore, it appears that the individual liability of supervisors is not clearly precluded.

### C.  Analysis of the Claims Against Qualxserv and Doonan

This case does not involve direct evidence of discrimination.[16] There are two methods of

---

[15]    Title VII defines "employer" to include certain persons who employ 15 or more workers and "any agent of such a person." 42 U.S.C. § 2000e(b).

[16]    Even were this court to assume that the *pro se* Plaintiff did make such an argument, the court would conclude that none of the evidence rises to the level of direct evidence. As Judge Duffy noted in *Signal v. Gonzales,* 430 F.Supp.2d 528 (D.S.C. 2006):

> Direct evidence is a term of art, specifically defined. It both (1) reflects the alleged discriminatory attitude and (2) bears directly on the contested employment decision. *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir.1989). In *Earley v. Champion Int'l Corp.*, 907 F.2d 1 077, 1082 (11th Cir. 1990), the Eleventh Circuit stated, "[o]ne example of direct evidence would be a management memorandum saying, 'Fire Earley-he is too old.' " In addition, this court has stated that "[a]n example of direct evidence would be a piece of paper saying, 'discipline Thomas, she is black.' " *Thomas v. Westinghouse Savannah River Co.*, 21 F.Supp.2d 551, 555 (D.S.C. 1997) (Simons, J.). *Signal v. Gonzales*, 430 F.Supp.2d at 540, n.5.

proving a case of intentional discrimination under Title VII using indirect evidence: the method

set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (pretext) and the method

established in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (mixed-motive). *See Hill v.*

*Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284 (4th Cir. 1994). Regardless of

which method is used to analyze the claim, the Plaintiff has the ultimate burden of presenting

evidence from which a reasonable jury could conclude that the Defendants intentionally

discriminated against him based on his race and nationality.

### 1.  The *McDonnell Douglas* "pretext" Framework of Analysis

Under the *McDonnell Douglas* paradigm of analysis, as refined in *St. Mary's Honor Ctr.*

*v. Hicks*, 509 U.S. 502 (1993), and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the plaintiff has the initial burden of demonstrating a

*prima facie* case of discrimination.  Under the *McDonnell Douglas* framework, a Title VII

plaintiff relying on indirect evidence first must establish a *prima facie* case of discrimination by

showing that (1) he is a member of a protected class; (2) he was qualified for his job and his job

performance was satisfactory; (3) he suffered an adverse employment action; and (4) other

employees who are not members of the protected class did not suffer an adverse employment

action under apparently similar circumstances. *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir.

2005); *Hill*, 354 F.3d at 285; *Bryant v. Bell Atlantic Maryland*, Inc., 288 F.3d 124, 133 (4th Cir.

2002).  Under some circumstances, the fourth element can be established by presenting evidence

raising an inference of discrimination. *See Miles v. Dell, Inc.*, 429 F.3d at 486-87; *EEOC v.*

*Sears Roebuck & Co.*, 243 F.3d 846, 851 n. 2 (4th Cir. 2001) (*citing Texas Dept. of Community*

*Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Once plaintiff has established a *prima facie* case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the actions about which the plaintiff complains. *Reeves*, 530 U.S. at 142; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Significantly, the presumption of discrimination arising from the establishment of a *prima facie* case merely obligates a defendant to produce evidence explaining its actions and does not, as is sometimes said, create an inference of discrimination. *Miles*, 429 F. 3d at 480 n.5 (the *prima facie* standard in the Title VII context is used only to create a "rebuttable presumption" and "not in the sense of 'enough evidence to permit the trier of fact to infer the fact at issue'"), *quoting Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978). Once the defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, "'the McDonnell Douglas framework – with its presumptions and burdens' – disappear[s], and the sole remaining issue is 'discrimination *vel non*.'" *Reeves*, 530 U.S. at 143, *quoting St. Mary's Honor Center*, 509 U.S. at 510 *and Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). In other words, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reasons produced by the defendant were not its true reasons, but were a pretext for discrimination. *Reeves*, 530 U.S. at 143. While the burden of production shifts between the plaintiff and the defendant under the first two prongs of the *McDonnell-Douglas* framework, the burden of persuasion that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Reeves*, 530 U.S. at 143. The Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury

could conclude the Defendants intentionally discriminated against him based on his race and national origin.

The third step in the *McDonnell-Douglas* analysis focuses on the ultimate question of whether the employer discriminated against the employee.  At this stage of the analysis, the employee must show that the nondiscriminatory reasons explaining the employer's challenged employment decisions are "unworthy of credence."  *Burdine*, 450 U.S. at 256. 253-254. "[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination" but does not compel such a finding because, as mentioned above, the "Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'"  *St. Mary's Honor Center*, 509 U.S. at 511, *quoting Aikens*, 460 U.S. at 716.  This third stage of the analysis is referred to as the "pretext" stage because, if the employee establishes that the employer's proffered reasons for its actions are false, a jury may infer that they are offered as a pretext designed to mask a discriminatory intent.  *Reeves*, 530 U.S. at 143; *St. Mary's Honor Center*, 509 U.S. at 507-508.

### a.  Application of the *McDonnell-Douglas* Test

Applying the three-step *McDonnell Douglas* test to the facts of the present case, the Court first must determine whether Plaintiff has set forth a *prima facie* case.  Plaintiff satisfies the first element of the *prima facie* case because he is Asian and Vietnamese and therefore is a member of a protected class.  Defendants do not dispute this.[17]  With respect to the second element, Plaintiff contends he was qualified to do the job of QSP and continues to perform that

---

[17]     Defendants' Brief [61] at p. 18.

job for the Defendant in a satisfactory manner.[18]  Defendants likewise concede this element.[19]

With respect to the third part of the *prima facie* case, Plaintiff contends he suffered an adverse

employment action because "Plaintiff was terminated, had the termination reduced to discipline

and has suffered a significant reduction in pay with the Defendant."[20]  However, Plaintiff's case

fails because the Plaintiff was not subjected to any adverse employment action and thus cannot

meet his burden of establishing the third prong of the *prima facie* case.  Finally, Plaintiff has put

forth no credible evidence to prove the fourth prong of the prima facie case –that other

employees who are not members of the protected class did not suffer an adverse employment

action under apparently similar circumstances.

### 1.  What is an Adverse Employment Action?

To show a violation of an employment discrimination laws, "a plaintiff must establish

that an adverse employment action has occurred."  *Bristow v. Daily Press, Inc.*, 770 F.2d 1251,

1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986).  "An

adverse employment action is a discriminatory act which adversely affects the terms, conditions,

or benefits of the plaintiff's employment."  *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371,

375-76 (4th Cir. 2004).  In *Page v. Bolger*, 645 F.2d 227 (4th Cir.) (*en banc*), *cert. denied*, 454

U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981), the Fourth Circuit examined the question of

what constituted "adverse employment action" and noted that inquiries "consistently focused on

the question whether there has been discrimination in what could be characterized as ultimate

---

[18]      Plaintiff's Brief [66] at p. 10.

[19]      Defendants' Brief [61] at p. 18.

[20]      Plaintiff's Brief [66] at p. 10.

employment decisions such as hiring, granting leave, discharging, promoting and compensation." *Id.* at 233. *See also Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999) (A showing of an "adverse employment action" that would support a Title VII claim includes "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion."); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"). *Cf. Lewis v. Forest Pharmaceuticals, Inc.,* 217 F.Supp.2d 638, 648 (D.Md. 2002) ("Reprimands, whether oral or written, do not *per se* significantly affect the terms or conditions of employment.") *(citing Nye v. Roberts,* 159 F.Supp.2d 207, 213 (D.Md.2001))*; Flaherty v. Gas Research Institute*, 31 F.3d 451, 456 (7th Cir.1994) (a "bruised ego" is not enough); *Naughton v. Sears, Roebuck & Co.,* No. 02-4761, 2003 WL 360085 at *5 n. 1 (N.D.Ill. 2003) (criticism, including a negative performance review or development plan, does not constitute an adverse employment action).

Based upon a thorough review of the record, including the parties' pleadings and attachments, the Court concludes that the Plaintiff cannot establish the third element of his *prima facie* case, that is, he cannot establish that he suffered an "adverse employment action" by means

of any of the events about which he complains.

### a. Plaintiff's Suspension, Termination and Rehiring

First, with respect to Plaintiff's suspension and termination on Friday, August 17, 2006, Doonan suspended Plaintiff after Plaintiff admitted to Doonan that he had accepted a payment from a customer for installing software on her computer, which is a violation of the Policy. After speaking with Human Resources, Doonan notified Plaintiff that his employment was terminated. Plaintiff was terminated pursuant to QualxServ's written personnel policies which expressly warns employees to "avoid conflicts of interest," to refrain from using "their positions at the Company to benefit . . . themselves independently of the Company's business," and, specifically, to refrain from "any outside business activity involving contact with or work for customers[.]"[21] Although Plaintiff stated in his deposition that he did not remember seeing a copy of the Policy,[22] he acknowledged that he had agreed to comply with the Code of Conduct when signing an initial employment agreement with QualxServ.[23] Plaintiff further he testified that he had at all times been aware of the Policy prohibiting him from performing non-Company work or soliciting non-Company business while on Company time.[24] Doonan's decision to terminate Plaintiff was consistent with those he had made in the past to terminate other QSPs for similar infractions.[25] Plaintiff acknowledged in his deposition that Doonan told him the reason

---

[21]     QualxServ Employment Agreement signed by Plaintiff on May 18, 2000, attached as Ex. 9 to Defendants' Brief.  [61]

[22]     Plaintiff's Dep. at 29, attached as Ex. 3 to Defendants' Brief.  [61]

[23]     Plaintiff's Dep. at 18-19, attached as Ex. 3 to Defendants' Brief [61]; see also "Standards of Ethics and Business Conduct" attached as Ex. 8 to Defendants' Brief.  [61]

[24]     Plaintiff's Dep. at 29, attached as Ex. 3 to Defendants' Brief.  [61]

[25]     Doonan's Dep. at 20-21, attached as Ex. 4 to Defendants' Brief.  [61]

for the suspension and termination was the fact that Plaintiff had accepted a payment from a customer.[26]  During the discussion surrounding the suspension and termination, Doonan did not make any comments to Plaintiff about his race or national origin, and, significantly to the Court, Plaintiff did not come to the conclusion at the time of those discussions that Doonan was discriminating against him.[27]  Doonan, at the time, was not even aware of Doan's race or national origin, because Doonan worked in QualxServ's headquarters in Massachusetts and had never met Plaintiff.[28]  Doonan was not aware of Plaintiff's race or nationality until Plaintiff filed a claim with the EEOC.[29]

In the present case, it is undisputed that the Plaintiff was reinstated on the next business day (Monday, August 21), after he spoke with Karen Moriarty and asked to be reinstated.[30] Moriarty told Plaintiff she would review the incident and get back to him.[31]  Moriarty spoke to Doonan, and Doonan confirmed that Plaintiff was a good technician and said this was the first time there had been a serious issue with respect to Plaintiff.  Moriarty asked Doonan if he would consider reinstating Plaintiff, and Doonan agreed to do so.[32]  Moriarty went back to her office and called Plaintiff to tell him that QualxServ was changed the termination decision to a written

---

[26]    Plaintiff's Dep. at 59-63, attached as Ex. 3 to Defendants' Brief [61].

[27]    Plaintiff's Dep. at 62, attached as Ex. 3 to Defendants' Brief [61].

[28]    Doonan Aff. at ¶ 5, attached as Ex. 1 to Defendants' Brief.

[29]    Doonan Aff. at ¶ 5, attached as Ex. 1 to Defendants' Brief.

[30]    JFB ¶ 12.

[31]    JFB ¶ 13.

[32]    JFB ¶ 14.

warning, and that he could have his job back.[33]  Doan told Moriarty he wanted to discuss another

issue with her, which was that he wanted to increase his call volume to what it had been when he

was first employed by QualxServ; Moriarty reminded him that he was a part-time employee and

under QualxServ's current business model, he would not return to the call volume he had had

when first hired in 2000.[34]

Plaintiff was reinstated by QualxServ on August 21, 2006[35] and resumed taking calls for

QualxServ on August 22, 2006.[36]  Plaintiff has remained as an employee of QualxServ since that

time.[37]

Plaintiff has not explained the reasons he believes his termination on a Friday and

subsequent rehire on a Monday constitutes an adverse employment action, other than to baldly

assert that it does.[38]  As mentioned above, Plaintiff was re-hired on Monday, August 21, and he

resumed taking calls for QualxServ on August 22, 2006.[39]  His job duties remained the same, and

he has continued to be responsible for calls within the same 21 ZIP Codes for which he was

responsible prior to the August 2006 incident.[40]  As had been the case prior to his termination, he

has continued to receive more calls in the Charleston area than any other QSP, and the volume of

---

[33]     JFB ¶ 15.

[34]     Moriarty Dep. at ¶ 10, attached as Ex. 2 to Defendants' Brief.  [61]

[35]     JFB ¶ 17.

[36]     Plaintiff's Dep at 69-70, attached as Ex. 3 to Defendants' Brief.  [61]

[37]     JFB ¶17; Plaintiff's Dep at 69-70, attached as Ex. 3 to Defendants' Brief.  [61]

[38]     Plaintiff's Brief [66] at p. 10.

[39]     Plaintiff's Dep at 69-70, attached as Ex. 3 to Defendants' Brief.  [61]

[40]     Doonan Aff. at ¶8, attached as Ex. 1 to Defendants' Brief.  [61]

calls assigned to him has remained consistent.  Moreover, Plaintiff has run more calls than any

other QSP in the Charleston area.[41]  The Court does not find that on these facts that Plaintiff's

brief termination and rehire constitute an "adverse employment action," as that term is defined in

the applicable caselaw.

### b.  Plaintiff's "Feelings"

Next, Plaintiff testified that he "feels" Doonan discriminated against him with respect to

the handling of his suspension and brief termination, but he has offered no evidence apart from

these feelings to rebut the legitimate, nondiscriminatory reasons for QualxServ's actions.  It is

well-settled that he cannot rely on his assertion that he "feels" as though he has been

discriminated against to support his claim.  *Hawkins v. Pepsi Co., Inc.*, 203 F.3d 274, 281 (4th

Cir. 1998) (plaintiff's conclusory assertions of discrimination "in and of themselves are

insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an

adverse employment action"); *see also Nichols v. Caroline County Bd. of Educ.,* 123 F.Supp.2d

320, 327 (D.Md. 2000) (black plaintiff's assertion that white supervisors subjected him to

adverse employment actions "because I am who I am" was insufficient; "the court cannot

attribute a racial character to the disagreement and misunderstandings between the parties based

merely on [plaintiff's] conjectural opinion.").  Plaintiff has offered no evidence to contradict

Defendants' contention that his suspension and termination were a result of his violation of

Company Policy.  There is no evidence to suggest that these actions were a result of any

unlawful animus directed towards Plaintiff.  Furthermore, Doonan has stated that Plaintiff's race

and national origin played no role in his decision to terminate his employment, and that he was

---

[41]        Doonan Aff. at ¶8, attached to Defendants' Brief as Ex. 1.  [61]

not aware of Plaintiff's race or nationality until Plaintiff filed a claim with the EEOC.[42]  Finally,

the record reflects that Doonan informed Human Resources as follows:  (1) other than the

incident with the side payment, Doonan had had no problems with Plaintiff; (2) Doonan

considered Plaintiff to be a good technician; and (3) Doonan would be willing to rescind the

termination and simply provide Plaintiff with a written warning, which he in fact did.[43]

Doonan's statements to Human Resources certainly do not suggest to the Court that Doonan bore

any racial or ethnic animus towards Plaintiff.

    In assessing whether Plaintiff's race and national origin played any role in his

termination, the Court notes that it is undisputed that Doonan fired Plaintiff on a Friday (only

after consulting with Human Resources) and re-hired him on a Monday (after being asked by

Human Resources to reconsider the matter).  As Judge Wilkinson has observed:  "One is quickly

drawn to the realization that claims that employer animus exists in termination but not in hiring

seem irrational."  *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (internal quotation and

citation omitted).  The facts of the present case are somewhat similar to those in *Proud v. Stone*,

wherein the Fourth Circuit Court of Appeals held that "in cases where the hirer and firer are the

same individual and the termination of employment occurs within a relatively short time span

following the hiring, a strong inference exists that discrimination was not a motivating factor for

the adverse action taken by the employer".  *Id.*, 945 F.2d at 797.  While the sequence here is the

reverse of the sequence of events in *Proud v. Stone* because the termination occurred first,

followed by a prompt re-hiring, the logic retains its force:  If Doonan had terminated Plaintiff

---

[42]    Doonan Aff. at ¶5, attached as Ex. 1 to Defendants' Brief.

[43]    Doonan Aff. at ¶7, attached as Ex. 1 to Defendants' Brief; Moriarty Aff. at ¶8, attached as
Ex. 2 to Defendants' Brief.

because Doonan harbored a discriminatory animus, he would not have provided positive

feedback to Moriarty about him, or have agreed to rehire him.

### c.  The Written Warning

Next, to the extent Plaintiff contends that the written warning (in lieu of termination) is

an adverse employment action, Plaintiff has stipulated to the fact that he agreed to comply with

the Standards of Ethics and Business Conduct Policy (the "Policy") when he was transitioned

from an employee of Getronics to QualxServ in May 2000.[44]  Plaintiff admitted in his deposition

that he was provided with a copy of the Policy.[45]  Regardless of whether Plaintiff received any

training regarding the Policy,[46] his receipt of a written warning for violation of the Policy does

not rise to the level of an adverse employment action.  *Richardson v. Horry County*, 2008 WL

806559 at *9 (D.S.C. March 31, 2008); *see Lewis v. Forest Pharmaceuticals, Inc.*, 217

F.Supp.2d 638, 648 (D.Md. 2002) ("Reprimands, whether oral or written, do not per se

significantly affect the terms or conditions of employment.") (*citing Nye v. Roberts*, 159

F.Supp.2d 207, 213 (D.Md. 2001)), *vacated and remanded on other grounds*, 2002 WL

31163732 (4th Cir. 2002)); *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 612-613 (7th Cir.

2001) (job related criticism, including negative performance reviews and oral or written

reprimands, does not constitute an adverse employment action absent some tangible job

consequence); *Naughton v. Sears, Roebuck & Co*., No. 02-4761, 2003 WL 360085 at *5 n. 1

(N.D.Ill. 2003) (criticism, including a negative performance review or development plan, does

---

[44]     JFB ¶10; Plaintiff's Dep. at 18-19; 50-54, attached as Ex. 3 to Defendants' Brief.  [61]

[45]     Plaintiff's Dep. at 19, attached as Ex. 3 to Defendants' Brief.  [61]

[46]     Plaintiff's Fact at ¶5.

not constitute an adverse employment action).

### d.  Reduction in Pay

Plaintiff contends that he has suffered an adverse employment action because he "has suffered a steady reduction in pay" over the last few years, due to a reduction in service calls which was a consequence of four additional employees being hired as QSPs for the same geographic area as Plaintiff.[47]  As a threshold matter, on December 4, 2002, Plaintiff agreed to an hourly reduction in pay (from $35.00 to $32.00) in return for his continuing employment with QualxServ.[48]  It follows that an employee who agrees to a reduction in hourly pay in return for continued employment would expect to have a reduction in annual income.

Plaintiff contended in his Complaint that after Doonan became his supervisor in June 2006, Plaintiff's salary decreased and he was harassed.  However, Plaintiff's most significant decreases in his call volume occurred well before Doonan became his supervisor, and do not appear to have any connection to the August 2006 events.[49]  The record before the Court indicates that Plaintiff began working as a QSP in Charleston in March 2000.[50]  As a QSP, he was a part-time employee.[51]  Plaintiff was paid on a per call basis; thus, the greater the number of

---

[47]    Plaintiff's Brief [66] at p. 11-12.

[48]    *See* letter to Plaintiff from QualxServ dated December 2, 2002, attached as Ex. 7 to Defendants' Brief [61] (outlining plan for a "new round of customer price reductions" in order to remain competitive.).

[49]    Plaintiff's Dep. at 20-23; 27-28; 32-35; 126, attached as Ex. 3 to Defendants' Brief; *see also*  Letter from QualxServ to Plaintiff dated December 2, 2002, attached as Ex. 7 to Defendants' Brief.  [61]

[50]    JFB ¶4.

[51]    JFB ¶ 2.

calls assigned to him, the greater his income.[52]  In his initial years with the Company, he earned

more income with QualxServ than in later years.[53]  According to Defendants, the drop in his

income was due to fluctuations in QualxServ's business as well as to an across-the-board

reduction in the amount of money QualxServ was paying its QSPs on a per call basis, which in

turn was driven by competitive business conditions.[54]  Plaintiff also earned more money in his

early years with QualxServ because he serviced two school districts –Charleston and Berkeley –

which provided significant call volume to him.[55]  Plaintiff testified that at one point the Berkeley

School District accounted for as much as 50 percent of his call volume, while the Charleston

School District accounted for approximately 10 percent of his volume.[56]  According to Plaintiff,

the Berkeley County School District ultimately hired its own technician and that the call volume

to QualxServ dropped significantly, down to an occasional call now and then.[57]  In addition to

the changes in business conditions, the reduction in his hourly wage, and the loss of the Berkeley

County School District account, all of which contributed to a loss in income, Plaintiff

---

[52]    JFB ¶6.

[53]    The parties agree that Plaintiff's wages are as follows:

| 2001 | $64,715.00 |
|------|------------|
| 2002 | $87,605.00 |
| 2003 | $71,995.50 |
| 2004 | $41,856.83 |
| 2005 | $44,100.92 |
| 2006 | $36,727.95 |

JFB, Plaintiff's Facts in Controversy #2-7 and Defendants' responses thereto.

[54]    JFB ¶18; Moriarty Aff. ¶10, attached as Ex. 2 to Defendants' Brief.

[55]    Plaintiff's Dep at 20-23, attached as Ex. 3 to Defendants' Brief.

[56]    *Id.* at 21-22.

[57]    *Id.* at 23.

acknowledged that QualxServ adopted a policy in 2003 designed to limit the number of calls

QSPs could take on a weekly basis.[58]  Under the new policy, QSPs were generally limited to

either 30 calls or 30 hours per week.[59]  Plaintiff's annual income from QualxServ was reduced as

a result of all of these changes.  Plaintiff has acknowledged that the policy applied to all QSPs

and has not alleged that there was anything discriminatory in the policy.[60]  Thus, Plaintiff has

conceded that QualxServ's business decisions (the reduction in the per call rate and the policy

regarding the number of calls to be taken) and the changes in business conditions (fluctuating

call volumes from customers and the loss of the school district account) accounted for the

reduction in his annual income before 2006.  Plaintiff cannot dispute the fact that the most

significant decreases in his call volume occurred well before the August 2006 events he relies on

to support his claim of discrimination.[61]  In fact, he testified that does not believe anyone at

QualxServ discriminated against him prior to August 2006, when Doonan was his supervisor, or

after Doonan transitioned to a different position.[62]

Nonetheless, Plaintiff alleges in his Brief that the reduction in his call volume (and the

corresponding reduction in his income) in 2006 is indicative of discriminatory conduct prior to

the August 2006 discipline.[63]  Based upon Plaintiff's other admissions, however, Plaintiff's

assertion that the reduction in his call volume in 2006 was the result of discrimination by

---

[58]    JFB ¶18; *see also* Lombardi Dep. at 10-11, attached as Ex. 5 to Defendants' Brief.  [61]

[59]    JFB ¶18.

[60]    RA Ex. 3: Doan TR 27-28.

[61]    RA Ex. 3: Doan TR 20-23; 27-28; 32-35; 126; RA Ex. 7.

[62]    RA Ex. 3: Doan TR 41, 114.

[63]    Plaintiff's Brief [66] at 12.

Doonan is without merit.  He offers no evidence to show that the reduction in his annual income

from QualxServ from 2005 to 2006 – a reduction that was less significant in gross dollar

amounts and percentage terms from reductions in previous years, when he does not allege any

discriminatory conduct – was tied to any discriminatory animus, as opposed to general market

conditions.  Moreover, an analysis of the Plaintiff's call volume compared to the call volume of

other QSPs in the Charleston area shows that Plaintiff received more calls than any of the other

QSPs in that area.  In particular, as QualxServ demonstrated to the EEOC, from August 21, 2006

– the date of his reinstatement – through December 2006 – when he filed his claim with the

EEOC – Plaintiff closed 358 calls while the three other QSPs in the Charleston area closed 239,

232, and 138 calls respectively.[64]

### e.  The Hiring of Additional Technicians

Plaintiff claims that he was discriminated against prior to the actual discipline in August

2006 when QualxServ hired four other technicians to cover Plaintiff's area, and none of those

technicians were in Plaintiff's protected class.[65]  Defendants contend that Plaintiff has never

identified the four employees allegedly hired into his service area, so it is not known to the Court

whether any were in Plaintiff's protected class.[66]  It appears from the evidence before the Court

that QualxServ hired only two other technicians in Plaintiff's area during Doonan's supervision

of Plaintiff:  (1) Robert Jeffcoat, a Caucasian, who was hired on June 14, 2006, prior to the

incident in August 2006; and (2) Maurese Odom, an African-American, hired after the August

---

[64]    Doonan Aff. ¶8, attached to Defendants' Brief as Ex. 1.

[65]    Plaintiff's Brief [66] at p. 12-13.

[66]    Defendants' Response to Plaintiff's Fact #14.

incident, in October 2, 2006.  There was a third substitute technician taking calls in the area, named Johnathan Wolff, who began running calls for QualxServ in January 2006, several months before Doonan became Plaintiff's supervisor.[67]  The hiring of other technicians cannot be viewed by the Court as an adverse employment action.

### f.  Call Assignments to Hollywood and Conway

Plaintiff also claims that Doonan harassed him with respect to call assignments to Hollywood and Conway in March 2007.  As a QSP, Plaintiff received information on his call assignments though the QualxServ computer program known as the Call Assignment Tool ("CAT").[68]  The call assignments are made automatically based on the ZIP Codes assigned to the technician, the technician's availability, and the technician's workload.[69]  When calls are assigned to a technician, they are said to be in that technician's "bucket."[70]  While technicians sometimes informally trade calls among themselves, they are not supposed to run the calls until the transfer has been approved by a supervisor and shifted over to their "bucket."[71]

In March 2007, Plaintiff "scooped" four calls in the Hollywood area from another technician's bucket and performed the calls without first notifying Doonan.[72]  After learning what had happened, Doonan retroactively approved what Plaintiff had done so that Plaintiff

---

[67]     See Doonan Aff. at ¶8 attached as Ex. 1 *and* Moriarty Aff. ¶3 attached as Ex. 2, both attached to Defendants' Brief.

[68]     Plaintiff's Fact #16 in controversy and Defendants' Response thereto.

[69]     Doonan Aff. ¶9, attached as Ex. 1; Doonan Dep. at 11, attached as Ex. 4, both attached to Defendants' Brief.

[70]     Doonan Aff. ¶9, attached as Ex. 1 to Defendants' Brief.

[71]     Doonan Aff. ¶13, attached as Ex. 1 to Defendants' Brief.

[72]     Doonan Aff. ¶14, attached as Ex. 1 to Defendants' Brief.

could close the calls and receive payment for them.[73]  When Doonan notified Plaintiff by e-mail that he had approved the calls, Doonan stated that, in the future, Doan should not run calls that were not in his bucket.[74]  Doonan's e-mail was meant to remind Plaintiff of QualxServ's policy; it was not a written warning or a disciplinary action.[75]  Although Plaintiff cites the incident as evidence of Doonan's alleged discrimination, the Court des not see how a manager's reiteration of corporate policy to an employee is evidence of discriminatory animus.  *See e.g., Hawkins*, 203 F.3d at 282 (supervisor's criticism of employee can be expected as part of the give and take of employment relationship); *see also Van Stan v. Fancy Colours & Co.,* 125 F.3d 563, 567 (7th Cir.1997) ("[P]ersonality conflicts and questioning of job performance are unavoidable aspects of employment." (internal quotation marks omitted)).

> As Judge Wilkinson observed in *Hawkins v. PepsiCo:*
>
> Law does not blindly ascribe to race all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion.  Instead, legally sufficient evidence is required to transform an ordinary conflict such as that between Hawkins and Price into an actionable claim of discrimination.  *See, e.g., Gairola [v. Virginia Dep't of Gen. Servs.,]* 753 F.2d [1281] 1285 [(4th Cir. 1985)] (evidence is legally insufficient if verdict for party offering that evidence would be necessarily based on speculation and conjecture).  The need for legally sufficient evidence of discrimination is critical in the context of this lawsuit.  Otherwise, supervisors such as Price could not evaluate employees of a different race without the prospect of a lawsuit.  As the Fifth Circuit has noted, without the freedom to criticize performance, an organization simply cannot function.  *See Johnson v. Merrell Dow Pharms., Inc.,* 965 F.2d 31, 34 (5th Cir. 1992) ( "In order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline employees.").  The dilemma is apparent.  If supervisors fail to supply enough criticism, they may be accused of a lack of feedback. If they criticize too much, they may be accused of discriminatory harassment.  Either way they may find themselves hauled into court to answer for their choice.  *Hawkins*, 203 F.3d at 282.

Plaintiff also contends that Doonan discriminated against him by assigning him a call in Conway, South Carolina.  As Doonan explained, QualxServ on occasion must find a QSP to

---

[73]     *Id.*

[74]     *Id.*

[75]     Doonan Aff. at ¶¶ 9-10, attached as Ex. 1 to Defendants' Brief.  [61]

handle a call in a rural area beyond the territories in which its technicians routinely perform their services.[76]  Because handling such calls may involve significant travel time, QualxServ pays technicians a bonus for taking the calls.[77]  Plaintiff complained to Doonan about the Conway call and asked for the payment of a mileage reimbursement which constituted more than what he would have been entitled to under QualxServ's policy.[78]  Doonan indicated he would not reimburse Plaintiff for any amount beyond which he would be entitled.  Plaintiff told him he would not take the call, and Doonan agreed to find someone else to take the call.[79]

In sum, with respect to the Hollywood and Conway calls, Plaintiff either took the calls at issue and received payment on them,[80] or was allowed, at his request, to pass on taking the call.[81]  The Plaintiff may not agree with how Doonan interacted with him with respect to the two matters, but there is nothing in the evidence offered by Plaintiff that even hints at an intent to discriminate against him.

### g.  The Customer Survey

Plaintiff contends that a customer survey with negative comments about him which was posted on an intranet site (to which he had the only access) is evidence of discrimination.[82]  Customers for whom QSPs perform work are asked to participate in a survey relating to their

---

[76]    Doonan Aff. ¶15 attached as Ex. 1 to Defendants' Brief.

[77]    *Id.*

[78]    Plaintiff's Dep. at 88-91, attached as Ex. 3 to Defendants' Brief.

[79]    Plaintiff's Dep. at 91, attached as Ex. 3 to Defendants' Brief.

[80]    Doonan Aff. ¶15, attached as Ex. 1 to Defendants' Brief.

[81]    Doonan Aff. ¶14, attached as Ex. 1 to Defendants' Brief.

[82]    Plaintiff's Dep. at 99-100, attached as Ex. 3 to Defendants' Brief.

experience with the technician.[83]  The surveys are performed by the computer manufacturer, not

QualxServ, and the individual surveys and cumulative scores are automatically posted on an

intranet site accessible to the QSP and his or her manager.[84]  The cumulative results are tabulated

and, with respect to individual technicians, referred to as their customer experience ("CE")

rating.[85]  According to Doonan, a QSP is only able to see his own CE ratings on the site, and his

cumulative CE rating, but he is not able to see surveys relating to other QSPs, which are

available only to management.  Contrary to Plaintiff's allegation, Doonan was not responsible

for posting survey results on the intranet.  In any event, Doan does not dispute that this one

negative survey had little impact on his cumulative scores, which remained acceptable, and that

QualxServ did not take any adverse employment action against him as a result of the survey.[86]

### h.  The Expense Reports

Next, Plaintiff alleges that Doonan's decision not to approve two expense reports for

Plaintiff's mileage submitted on November 11, 2006 is evidence of discrimination.[87]

QualxServ's per call pay rate to QSPs includes consideration for their routine travel expenses,

but QualxServ also has a policy pursuant to which only travel to or between calls that exceeds 35

miles will be reimbursed.[88]  In other words, if a technician travels 10 miles to his or her first call,

---

[83]    Defendants' Ex. 1: Doonan Aff. ¶16.

[84]    Id.

[85]    Id.

[86]    Plaintiff's Dep. at 100-101, attached as Ex. 3 to Defendants' Brief.

[87]    Plaintiff's Dep. at 100-103, attached as Ex. 3 to Defendants' Brief.

[88]    "Expense Report Guidelines" for QualxServ Technicians, attached as Ex. 11 to
Defendants' Brief.

20 miles to the next call, and then 15 miles back home, the technician will not receive any
mileage reimbursement because each leg of the trip is less than 35 miles.  On the other hand, if
the technician travels 45 miles to his first call, 40 miles from the first to the second call and then
50 miles home, he would be reimbursed for 30 miles (the cumulative amount in excess of 35
miles for each call).  Plaintiff acknowledges that he was aware of the mileage reimbursement
policy.[89]  However, Plaintiff testified that the expense reports he submitted should have been
approved because mileage for the trips for which he was seeking reimbursement all involved one
way travel of more than 35 miles, and he was only seeking reimbursement for the amount of
miles above 35.[90]  Doonan did not approve the reports, however, because a software program
used by QualxServ to confirm mileage submitted by all QSPs revealed that Doan had
exaggerated his mileage.[91]  For example, Plaintiff sought reimbursement for a trip on October 23,
2006 to James Island but QualxServ's records do not indicate that he took a call to James Island
that day.[92]  As another example, Plaintiff sought reimbursement for 20 and 25 miles for a trip to
and from Kiawah Island on October 24, indicating that his actual mileage would have been 55
miles to the island and 60 miles in returning, but a mapping program used by QualxServ
indicated the actual mileage was 35 miles each way, which would not entitle him to any
reimbursement.[93]  Thus, Plaintiff's expense reports were disallowed.  Plaintiff never took any

---

[89]     Plaintiff's Dep. at 101-103, attached as Ex. 3 to Defendants' Brief.

[90]     Plaintiff's Dep. at 101-103, attached as Ex. 3 to Defendants' Brief.

[91]     Doonan Aff. ¶12, attached as Ex. 1 to Defendants' Brief.

[92]     *See* Plaintiff's Expense Reports, attached as Ex. 12 to Defendants' Brief.

[93]     Doonan Aff. ¶12, attached as Ex. 1 to Defendants' Brief; *see also* Plaintiff's Expense
Reports, attached as Ex. 12 to Defendants' Brief.

contemporaneous steps to protest the decision or demonstrate that the mileage he had submitted was, in fact, accurate. Because Plaintiff never questioned QualxServ's disallowance of the reports, he should be estopped from raising the issue for the first time in federal court.[94] Notwithstanding the estoppel issue, the disapproval of the two expense reports simply cannot rise to the level of an adverse employment action because the record reveals that the mileage was not reimbursable under QualxServ's policies. In addition, the amount at stake – $100 – cannot be said to materially impact his compensation or employment.[95]

After a careful review of the record in this case, the court is of the opinion that none of the Defendants' actions were "adverse employment actions" taken in violation of Title VII. The Plaintiff has failed to set forth the third prong of his *prima* facie case.

## 2. Plaintiff's claim that he was treated differently than others outside his protected category.

Likewise, Plaintiff cannot prove the fourth prong of his *prima facie* case. Plaintiff claims that he was treated differently from others, and thus was discriminated against. He supports this contention simply by claiming that another employee reporting to Doonan was not subjected to any discipline for accepting a side payment from a QualxServ customer. Plaintiff has offered no admissible evidence to support his contention. In response, QualxServ has set forth evidence showing that other employees not in Plaintiff's protected category have been terminated for similar conduct.[96] Plaintiff has failed to prove his *prima facie* case. Of course, it is only when

---

[94]     Doonan Aff. ¶¶11-12, attached as Ex. 1 to Defendants' Brief.

[95]     JFB ¶33;Doonan Aff. ¶¶11-12, attached as Ex. 1 to Defendants' Brief.

[96]     Doonan Dep. at 21-22, attached as Ex. 4. to Defendants' Brief.

the plaintiff succeeds in proving the *prima facie* case that the burden will shift to the

defendant-employer to articulate a legitimate non-discriminatory reason for its actions. *Texas*

*Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207

(1981) (*quoting McDonnell Douglas*, 411 U.S. at 802-03).  As the Plaintiff has failed to prove a

*prima facie* case of discrimination against the Defendants, the Court need not engage in further

analysis under the *McDonnell Douglas* test.  Under the undisputed facts, it is recommended that

the Defendants are entitled to judgment as matter of law for the Plaintiff's Title VII claims.

### Application of the *Price Waterhouse* "mixed-motive" Framework of Analysis

Although a plaintiff claiming discrimination on the grounds of race and/or national origin

also may proceed under the *Price Waterhouse* mixed-motive method of establishing intentional

discrimination, the Court finds that in the present case, given the above conclusion, the Plaintiff

will not be able to present sufficient evidence (direct or circumstantial), that, despite the

existence of legitimate, nondiscriminatory reasons for the adverse employment action, an illegal

factor (i.e., race or national origin) was a motivating factor in the decision.  *Hill*, 354 F.3d at

284-86.  To satisfy this test, Plaintiff need not show race was the sole motivating factor but only

that it was a motivating factor.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  The racial bias

must come from a relevant decision maker.  Also, the protected trait "must have actually played

a role in the employer's decision making process and had a determinative influence on the

outcome."  *Hill*, 354 F.3d at 286.  After a careful review of the facts of this case, the Court finds

absolutely no evidence that Plaintiff's race and national origin factored in any way into any of

the employment and management decisions made by Doonan and QualxServ with respect to

Plaintiff.  Plaintiff has offered no admissible evidence to show that race or national origin played

any role in those decisions. It is clear that Plaintiff cannot sustain his claims for discrimination under Title VII under the "mixed motive" framework of analysis.

## VIII.    DEFENDANTS' MOTION TO STRIKE

The Defendants have moved to strike Paragraphs 10-13, 15-19, 33, 38, and 39-41 of the Plaintiff's Affidavit filed in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment. [70] Plaintiff responded to the Defendants' Motion to Strike. [76] Defendants contend that these Paragraphs should be struck because they contain inadmissible legal conclusions (Paragraphs 10-13; Paragraph 33), or they are based on inadmissible hearsay or are completely unsupported by the evidence of record (Paragraphs 15-19; Paragraph 38; Paragraphs 39-41). The Court has reviewed each of the Paragraphs at issue and finds the Defendants' Motion to Strike is well-founded. Accordingly, it is recommended that this motion be granted.

## IX.    ATTORNEYS' FEES

An award of attorneys' fees to a defendant is appropriate in a Title VII case when a plaintiff's case is "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 422 (1978); *see also Bass v. E.I. DuPont De Nemours & Co.*, 324 F.3d 761, 766 (4th Cir. 2003) (same). A finding of bad faith in bringing suit is not required. *Christiansburg Garment*, 434 U.S. at 421. The Court is mindful that Plaintiff commenced this action *pro se*, and later retained counsel. Over the course of this litigation, Plaintiff failed to establish a *prima facie* case of discrimination. Indeed, Plaintiff failed to establish two out of the four necessary elements of his prima facie case. While the Court has no evidence that Plaintiff acted in bad faith in bringing his

suit, the court finds Plaintiff's complaint is frivolous. *See Furgess v. United Parcel Service, Inc.*, 2007 WL 1100780 at *2 (D.S.C. April 11, 2007) (Judge Currie awarded attorneys' fees to defense counsel where there was no evidence that the plaintiff acted in bad faith in bringing suit, but the court found that the plaintiff's complaint was frivolous.). It is respectfully recommended that the District Court consider whether an award of attorneys' fees would be appropriate in the present case.

## RECOMMENDATION

For the foregoing reasons, it is recommended that the **Defendants' Motion for Summary Judgment [61] be granted; that Defendants' Motion to Strike [70] be granted, and that the District Court consider awarding attorneys' fees to the Defendants due to the frivolousness of the Plaintiff's Complaint.**

GEORGE C. KOSKO
UNITED STATES MAGISTRATE JUDGE

April 22, 2008

Charleston, South Carolina